## UNITED STATES DISTRICT COURT FOR THE
## MIDDLE DISTRICT OF PENNSYLVANIA

RONALD J. GALBREATH,       :
                            :

         Plaintiff     :    No. 3:13-CV-2157
                            :

         vs.        :    (Judge Nealon)
                            :

CAROLYN W. COLVIN, Acting  :
Comissioner of Social Security,  :
                            :

         Defendant    :

FILED
SCRANTON
SEP 3 0 2014

PER _____
DEPUTY CLERK

## MEMORANDUM

On August 14, 2013, Plaintiff, Ronald J. Galbreath, filed this instant appeal[1] under 42 U.S.C. § 405(g) for review of the decision of the Commissioner of Social Security denying his application for supplemental security income ("SSI")[2] under Title XVI of the Social Security Act, 42 U.S.C. § 1381 et seq. (Doc. 1). The parties have fully briefed the appeal. For the reasons set forth below, the decision of the Commissioner denying Plaintiff's application for SSI will be affirmed.

---

1. Under the Local Rules of Court "[a] civil action brought to review a decision of the Social Security Administration denying a claim for social security disability benefits" is "adjudicated as an appeal." M.D. Pa. Local Rule 83.40.1.

2. Supplemental security income is a needs-based program, and eligibility is not limited based on an applicant's date last insured.

**BACKGROUND**

Plaintiff protectively filed[3] his application for SSI on March 12, 2010.  (Tr. 164).[45]

The claim was initially denied by the Bureau of Disability Determination

("BDD")[6] on July 27, 2010.  (Tr. 20).  On September 13, 2010, Plaintiff filed a

written request for a hearing before an administrative law judge.  (Tr. 20).  A

hearing was held on August 18, 2011 before administrative law judge Randy Riley

("ALJ"), at which Plaintiff, a vocational expert, Michael J. Kibler ("VE"), and

medical expert, Robert S. Brown, M.D. ("ME") testified.  (Tr. 20).  On September

27, 2011, the ALJ issued a decision denying Plaintiff's claims because, as will be

explained in more detail infra, Plaintiff could perform a full range of light work

with the option to alternate between sitting and standing at will, and with only

occasional climbing of stairs or ladders, balancing, stooping, kneeling, crouching

---

3.  Protective filing is a term for the first time an individual contacts the Social Security Administration to file a claim for benefits.  A protective filing date allows an individual to have an earlier application date than the date the application is actually signed.

4.  References to "(Tr. _)" are to pages of the administrative record filed by Defendant as part of the Answer on November 14, 2013.  (Doc. 12).

5.  The administrative law judge mistakenly lists Plaintiff's SSI application filing date as March 1, 2010.  (Tr. 20).

6.  The Bureau of Disability Determination is an agency of the state which initially evaluates applications for disability insurance benefits on behalf of the Social Security Administration.

or crawling. (Tr. 25).

On November 18, 2011, Plaintiff filed a request for review with the Appeals Council. (Tr. 8). On June 14, 2013, the Appeals Council concluded that there was no basis upon which to grant Plaintiff's request for review. (Tr. 1-3). Thus, the ALJ's decision stood as the final decision of the Commissioner.

Plaintiff filed the instant complaint on August 14, 2013. (Doc. 1). On November 14, 2013, Defendant filed an answer and transcript from the Social Security Administration ("SSA") proceedings. (Docs. 11 and 12). Plaintiff filed a brief in support of his complaint on December 20, 2013. (Doc. 15). Defendant filed a brief in opposition on January 31, 2014. (Doc. 18). Plaintiff did not file a reply brief. The matter is now ripe for review.

Plaintiff was born in the United States on April 15, 1975, and at all times relevant to this matter was considered a "younger individual"[7] whose age would not seriously impact his ability to adjust to other work. 20 C.F.R. § 404.1563(c); (Tr. 38, 164).

---

7. The Social Security regulations state that "[t]he term younger individual is used to denote an individual 18 through 49." 20 C.F.R., Part 404, Subpart P, Appendix 2, § 201(h)(1). "Younger person. If you are a younger person (under age 50), we generally do not consider that your age will seriously affect your ability to adjust to other work. However, in some circumstances, we consider that persons age 45-49 are more limited in their ability to adjust to other work than persons who have not attained age 45." 20 C.F.R. §§ 404.1563( c), citing Rule 201.17 in appendix 2.

Plaintiff did not obtain either his high school diploma or his GED, and can communicate in English. (Tr. 39). His employment records indicate that he previously worked as a car detailer. (Tr. 190). The records of the SSA reveal that Plaintiff had earnings in the years 1990 and 2002. (Tr. 178). His annual earnings range from a low of no earnings from 1991 to 2001 and from 2003 to 2011 to a high of ten thousand sixty-seven dollars ($10,067.00) in 2002. (Tr. 178). His total earnings during those twenty-one (21) years were ten thousand ninety-three dollars and eighty cents ($10,093.80). (Tr. 178). Plaintiff's alleged disability onset date is November 21, 2001. (Tr. 20, 164). The impetus for his claimed disability is a combination of congestive heart failure ("CHF"), Grave's disease with concomitant hypothyroidism, and high blood pressure ("HBP"). (Tr. 188).

In a document entitled "Function Report - Adult" filed with the SSA in April of 2010, Plaintiff indicated that he was single, and lived with his girlfriend. (Tr. 200). He noted that he could take care of his personal care needs, such as showering and getting dressed, without any problems, assistance or reminders. (Tr. 200-202). He also was able to cook five (5) times a week, sweep the floor, do the laundry, and make the bed without assistance. (Tr. 200, 202). Plaintiff did not drive because he did not have a license. (Tr. 203). He was able to shop for clothes and groceries. (Tr. 203). He could count change, handle a savings

4

account, and use a checkbook. (Tr. 203).

Regarding his concentration and memory, Plaintiff denied having memory problems or needing special reminders to take care of his personal needs and to take his medicine. (Tr. 201-202). He also stated that he did not need anyone to accompany him when he left his house. (Tr. 203). He could pay attention "with no problems," could follow written and spoken instructions "good," could handle stress "good," and was "alright" with handling changes in routine. (Tr. 205-206).

Socially, Plaintiff played cards and talked to others "maybe five (5) days a week," went to his girlfriend's mother's house two (2) to three (3) times a week, and stated that there was no change in social activities since the impairments causing his alleged disability began. (Tr. 204-205). He also watched tv and played video games. (Tr. 204). He reported that he did not have problems getting along with family, friends, neighbors, or others. (Tr. 205). In the function report, when asked to check items which his "illnesses, injuries, or conditions affect," Plaintiff did not check squatting, bending, reaching, sitting, talking, hearing, memory, completing tasks, concentration, understanding, following instructions, using hands, and getting along with others. (Tr. 205). He stated that he was able to lift forty (40) pounds, could kneel for five (5) minutes, stand for an hour and a half, climb two (2) flights of stairs, and walk one and a half blocks. (Tr. 205).

5

In the Supplemental Function Questionnaire, Plaintiff noted that he experienced fatigue when walking, running, lifting, and climbing steps. (Tr. 208). He noted that when doing these things, his heart would begin to beat "hard and fast." (Tr. 208). However, he also stated that this fatigue did not occur all the time, and was worse at night when his "meds [were] done doing their job." (Tr. 208). In this questionnaire, he also noted that he was not in pain. (Tr. 209). Regarding medications, Plaintiff reported that he took Levothyroxine, Metoprolol, Lisinopril, and Digoxin. (Tr. 208).

At his hearing, Plaintiff alleged that the following combination of physical problems prevented him from being able to work since November of 2001: (1) congestive heart failure; (2) varicose veins; (3) problems with his hand due to an accident that required thirteen (13) stitches; and (4) Grave's disease with concomitant hypothyroidism . (Tr. 45-56). He testified that he could dress, shower, cook, grocery shop, wash the dishes and laundry, vacuum, sweep, and take out the trash. (Tr. 40). In terms of physical limitations, he testified that he could partially bend over to touch his toes, and could put on his own socks and shoes. (Tr. 41). He could partially squat down to pick something up from the ground, but stairs and ladders were a problem because climbing them caused heart palpitations. (Tr. 41-42). He stated he was able to walk half of a block because

6

his heart would palpitate if he walked any further. (Tr. 42). He testified that he could stand, but that he would sometimes experience a sharp pain in his leg. (Tr. 42). He was able to sit, but not for "too long" because that would cause his legs to swell. (Tr. 42). He stated that medication helped somewhat, but that he experienced side effect from it, including blurry vision, dizziness, and heart palpitations. (Tr. 43). He testified that he could carry between ten (10) and twenty (20) pounds with his left hand, "but with the help of [his right] hand, [he] could lift much more." (Tr. 39, 174). At the time of the hearing, Plaintiff was using a cane that was not prescribed to him by a doctor. (Tr. 36-37). He claimed that he could no longer cook, do yard work, shop, or do the laundry. (Tr. 32-33).

**MEDICAL RECORDS**

Before the Court addresses the ALJ's decision and the arguments of counsel, Plaintiff's relevant medical records will be reviewed in detail, beginning with records from his alleged disability onset date of November 1, 2001.

On July 19, 2005, Plaintiff presented to the emergency room ("ER") at Chambersburg Hospital for trouble breathing. (Tr. 226). His past medical history noted that he had cardiomegaly and hyperthyroidism. (Tr. 226). His medication list included Coreg, Monopril, Propylthiouracil, Pepcid and Lanoxin. (Tr. 226). He was subsequently admitted for a work-up with cardiologist David Kent, M.D.

(Tr. 229).   Dr. Kent admitted Plaintiff to the progressive care unit, ordered an echocardiogram ("ECG"), and referred him to Aylmer Tang, M.D.  (Tr. 231-233). An electrocardiogram ("EKG") was performed, and indicated normal results.  (Tr. 226-227).  An x-ray of Plaintiff's lungs revealed cardiomegaly.  (Tr. 225).  A thyroid uptake and scan revealed Grave's disease.  (Tr. 235).  A renal ultrasound revealed mildly increased renal cortical echo texture indicative of medical renal disease.  (Tr. 240).

Dr. Tang's impression notes stated Plaintiff had hyperthyroidism, congestive heart failure secondary to his thyroid condition, gastroesophageal reflux disease, renal insufficiency, and increased liver function tests.  (Tr. 234). Plaintiff was treated with intravenous Lasix, and was prescribed beta blockers, Lopressor, an ACE inhibitor, and Aldactone, and was told to discontinue Coreg. (Tr. 234).  He was discharged on July 22, 2005.  (Tr. 229, 238).  His discharge summary stated that his principal diagnosis was congestive heart failure, and his secondary diagnoses included Grave's disease, resolved acute renal failure, substance abuse, and abnormal liver function tests.  (Tr. 238).  His medications upon discharge included Monopril, Digoxin, Aldactone, Lasix, Toprol, Pepcid, and PTU.  (Tr. 238).  An appointment was made for Plaintiff for August 5, 2005 at the Hershey Medical Center Endocrinology Clinic.  (Tr. 238).

On October 14, 2005, Plaintiff had an appointment with Svetlana Douglas, M.D. at Hershey Medical Center Endocrinology Clinic. (Tr. 267-269). In a letter to referring physician Dr. Tijani, she stated that Plaintiff suffered from hyperthyroidism, and that medication compliance had been an issue for him because he did not receive treatment while incarcerated. (Tr. 267). His symptoms at this visit included fatigue, palpitations, weight fluctuation, backaches and cramps, fullness in his neck, and occasional difficulty swallowing. (Tr. 267). Dr. Douglas reiterated Plaintiff's hyperthyroidism diagnosis, ordered a thyroid hormone panel, and recommended radioactive iodine treatment and subsequent thyroid hormone replacement therapy. (Tr. 268).

On November 27, 2005, Plaintiff presented to the ER at Chambersburg Hospital for shortness of breath, and the attending physician was Lawrence Boyler, M.D. (Tr. 253). The assessment noted that Plaintiff had dyspnea, congestive heart failure, and hyperthyroidism. (Tr. 253).

On January 24, 2006, Plaintiff presented to the ER at Chambersburg Hospital for shortness of breath and chest pain. (Tr. 247, 249). The attending physician was Dr. Boyler. (Tr. 247). Chest x-rays revealed cardiomegaly without change since Plaintiff's July 2005 visit. (Tr. 247). An EKG revealed "widespread ST changes, also incomplete left bundle branch-block pattern, and evidence of left

9

atrial enlargement." (Tr. 248). The EKG report noted that these findings were consistent with the EKG findings from Plaintiff's July 2005 visit. (Tr. 248). Dr. Boyler stated that he believed the hyperthyroidism was the underlying cause of most of Plaintiff's medical problems. (Tr. 247). Plaintiff was encouraged to follow up with Hershey Medical Center Endocrinology Clinic. (Tr. 247).

On July 4, 2006, Plaintiff presented to the ER at Chambersburg Hospital for difficulty breathing, abdominal bloating, and a ten (10) pound weight loss over a two (2) week period. (Tr. 241). Plaintiff was admitted to the hospital by James Freeman, M.D. (Tr. 243). Chest x-rays revealed continued cardiomegaly similar to the study conducted during Plaintiff's July 2005 admission. (Tr. 243).

On July 4, 2006, Dr. Freeman transferred care of Plaintiff to Hershey Medical Center. (Tr. 242, 260). The history notes provided by endocrinologist Robert McCauley, M.D. and ER physician Mark Kimak, M.D. from the ER at Hershey noted that Plaintiff had Grave's disease and presented to Hershey with congestive heart failure secondary to noncompliance with his medications. (Tr. 260, 265). The notes also stated that Plaintiff was started back on his medications, and improved greatly as a result. (Tr. 260). Plaintiff was discharged on July 5, 2006 with the following medications: Tapazole, Lasix, Aldactone, Toprol, Digoxin, and Monopril. (Tr. 260, 266). A follow-up appointment was scheduled

at the Hershey Medical Center Endocrinology Clinic for July 14, 2006. (Tr. 260).

In September of 2008, while incarcerated at the State Correctional Institute in Huntingdon, Pennsylvania ("SCI-Huntingdon"), Plaintiff underwent a physical examination. (Tr. 271). The remarks from this exam noted that Plaintiff had hyperthyroidism and congestive heart failure that was uncontrolled and moderate to severe. (Tr. 272-273).

Plaintiff had more physical exams at SCI-Huntingdon on May 26, 2009, June 19, 2009, and June 24, 2009 for chest pain. (Tr. 284). Treatment notes from these exams again noted that Plaintiff suffered from hyperthyroidism and cardiomyopahty. (Tr. 284-285).

On July 16, 2009, Plaintiff was sent by an SCI-Huntingdon physician for an ECG due to possible cardiomyopathy. (Tr. 277-278). The ECG found the following: (1) the global systolic function of the left ventricle appeared to be mildly to moderately impaired, and there was evidence of a mild degree of change dilation consistent with congestive cardiomyopathy; (2) a mild degree of mitral regurgitation; and (3) a trace degree of tricuspid regurgitation flow. (Tr. 279).

On October 16, 2009, Plaintiff had another physical examination at SCI-Huntingdon, at which he complained of changes and raspiness in his voice. (Tr. 280). The remarks from this exam noted that Plaintiff had hyperthyroidism,

congestive heart failure, and bradycardia. (Tr. 282).

On November 3, 2009, SCI-Huntingdon ordered blood work for Plaintiff. (Tr. 275). Plaintiff's blood work revealed that his thyroid-stimulating hormone ("TSH") level was high at 15.65, with the normal range being between 0.27 and 4.2. (Tr. 276).

On December 24, 2009, Plaintiff had another exam at SCI-Huntingdon, at which he again complained of changes and hoarseness in his voice. (Tr. 282). Plaintiff stated that he had run out of Synthroid three (3) days earlier, and was feeling better not taking it; however, he noted that he resumed taking Synthroid because he knew he needed it. (Tr. 282).

On December 29, 2009, SCI-Huntingdon ordered blood work to recheck Plaintiff's TSH level. (Tr. 274). Plaintiff's TSH level from this visit was 1.730, which was within normal range. (Tr. 274).

On February 25, 2010, Plaintiff had his last physical examination at SCI-Huntingdon due to parole. (Tr. 287). His listed chronic conditions included congestive heart failure and hyperthyroidism. (Tr. 287). There were no physical limitations or special needs noted. (Tr. 287). His prescribed medications included the following: Synthroid; Lisinopril; Digoxin; Lopressor; and Colace. (Tr. 287).

On May 3, 2010, Plaintiff had an appointment with Stephanie Cabello, M.D.

at Keystone Internal Medicine. (Tr. 328). His past medical history stated that he had Grave's disease, for which he was treated with iodine therapy that left him with hypothyroidism. (Tr. 328). He also had a history of congestive heart failure, hypertension, painful varicose veins in his right leg, and allergic rhinitis. (Tr. 328-329). Dr. Cabello started Plaintiff on Cetirizine, and referred him to vascular surgery for treatment of his varicose veins. (Tr. 328).

On May 12, 2010, Plaintiff had an appointment at Franklin County Interventional Cardiology for a cardio study ordered by Dr. Cabello. (Tr. 303, 306, 309). The interpretation summary stated there was impaired left ventricular relaxation, mild to moderate dilation in the right ventricle, moderate dilation in the left ventricle, moderate global hypokinesis of the left ventricle, moderate dilation of the left atrium, and mild dilation of the right atrium. (Tr. 303, 306, 309).

On June 30, 2010, Plaintiff had an appointment with Dr. Cabello. (Tr. 327). She noted Plaintiff's medical history, and referred him again to "Vascular Surgery" for pain due to his varicose veins. (Tr. 327). His TSH level was on the low side, so Dr. Cabello decreased his Levothyroxine dosage. (Tr. 327).

On July 22, 2010, Plaintiff had an appointment with consultative examiner Amatul Khalid, M.D. (Tr. 295). Dr. Khalid filled out a medical source statement regarding Plaintiff's ability to perform work-related physical activities. (Tr. 294).

Dr. Khalid opined that Plaintiff could frequently lift and carry two (2) to three (3) pounds, could occasionally lift and carry ten (10) to twenty (20) pounds, and could occasionally lift twenty-five (25) pounds. (Tr. 294). Dr. Khalid further opined that Plaintiff could stand/ walk one (1) hour or less, and sit for thirty (30) minutes maximum in an eight (8) hour workday. (Tr. 294). Dr. Khalid noted Plaintiff had no limitations with regards to pushing and pulling, and that he could frequently bend, kneel, stoop, crouch, balance, and climb. (Tr. 295). He opined that the following were not affected by Plaintiff's impairments: reaching; handling; fingering; feeling; seeing; hearing; speaking; tasting/ smelling; and continence. (Tr. 295). Dr. Khalid's assessment of Plaintiff also stated that he had congestive heart failure with systolic dysfunction that was chronic, but stable, had hypertension, Grave's disease, hypothyroidism, and gastroesophageal reflux disease. (Tr. 301-302). His medications included Metaxalone, Lisniopril, Metoprolol, Digoxin, and Levothyroxine. (Tr. 302).

On September 9, 2010, Dr. Cabello examined Plaintiff for joint pain in his hands. (Tr. 324). His chronic problem list included moderately severe varicose veins, stable congestive heart failure, toxic diffuse goiter, hypothyroidism, Grave's disease, hypertension, and allergic rhinitis. (Tr. 324-325). Dr. Cabello referred Plaintiff to Dr. Esemude for a vascular surgery consultation for his varicose veins,

despite the fact that he missed his initial appointment with Dr. Esemude, and reminded him to get his TSH level checked.  (Tr. 326).  His medications at this appointment included Naprosyn, Cetirizine, Lisinopril, Digoxin, Levothyroxine, Motrin, Ecotrin, and Metoprolol.  (Tr. 326).

On October 25, 2010, Plaintiff had an appointment with Nowokere Esemuede, M.D. of South Central Surgical Associates for an evaluation of his varicose veins.  (Tr. 342).  A lower extremity venous duplex exam was conducted. (Tr. 344).  This test revealed that there was no evidence of deep vein thrombosis, superficial thrombophlebitis, or deep vein reflux, but found superficial venous reflux in the right greater saphenous vein from the sapheno-femoral junction to below the knee.  (Tr. 344).  Dr. Esemuede recommended that Plaintiff wear thigh high compression stockings, avoid excessive walking and standing, and keep his legs elevated.  (Tr. 343).  Plaintiff was instructed to follow-up with Dr. Esemuede in three (3) months.  (Tr. 343).

On October 26, 2010, Plaintiff had an appointment with Brian Michael, M.D. at Wellspan Endocrinology.  (Tr. 334).  Dr. Michael's treatment notes state that Plaintiff had history with Grave's disease that was treated with iodine therapy that left him in a hypothryoid state, and that he had congestive heart failure.  (Tr. 335).  His list of medications at this appointment included Lisinopril, Coreg,

Naproxen, Spironolactone, and Synthroid. (Tr. 335). His listed constitutional symptoms included tiredness, a decrease in weight, an increase in appetite, a sore throat, a choking sensation, a raspy voice, blood in his stool, difficulty climbing stairs, aggression, and restlessness. (Tr. 336). His exam revealed that his thyroid felt atrophic, was non-nodular and non-tender, and moved well with swallowing. (Tr. 336). His TSH level at this visit was reported to be 0.01. (Tr. 336).

Plaintiff had blood work done on December 8, 2010 that was ordered by Dr. Michael. (Tr. 338). This blood work noted that Plaintiff's Free T4 level was 1.6, and his TSH level was 0.05. (Tr. 338).

On December 22, 2010, Plaintiff had an appointment with Dr. Cabello for a cough, fatigue, hoarseness, nasal congestion, post-nasal drainage, rhinitis, and a sore throat. (Tr. 321). Dr. Cabello diagnosed him with acute bronchitis. (Tr. 322). She also noted that he told her he had applied for SSI and that he had previously been on disability in New York. (Tr. 322). The listed chronic problems from this visit included congestive heart failure, unspecified acquired hypothyroidism due to history of Grave's disease, varicose veins, toxic diffuse goiter, hypertension, and allergic rhinitis. (Tr. 321-322). His medications included the following: Tirosint; Naprosyn; Lisinopril; Cetirizine; Ecotrin; and Motrin. (Tr. 322). His discontinued medications included Digoxin and

16

Metoprolol.  (Tr. 322).

On January 27, 2011, Plaintiff had an appointment with Dr. Michael for post-ablative hypothyroidism.  (Tr. 339).  Dr. Michael's notes reported that Plaintiff's energy had improved, his appetite was good, his weight was stable, he had no heat intolerance, and he was sleeping well.  (Tr. 339).  He denied exertional dyspnea, edema, chest pain and orthopnea.  (Tr. 339).  His medications list included Lisinopril, Coreg, Naproxen, Spironolactone, and Synthroid.  (Tr. 340).  Dr. Michael recommended that Plaintiff have his blood work repeated in late February, and would let Plaintiff know the results and whether his Synthroid dose would need to be adjusted.  (Tr. 339).

Also on January 27, 2011, Plaintiff had a follow-up appointment with Dr. Esemuede.  (Tr. 346).  Dr. Esemuede noted that Plaintiff continued to complain of painful varicose veins in his right leg despite the use of the compression stockings for over three (3) months.  (Tr. 346).  As a result, Dr. Esemuede recommended that Plaintiff proceed with right varicose vein excision and stripping or laser ablation.  (Tr. 347).

On February 16, 2011, Plaintiff had blood work performed that was ordered by Dr. Cabello.  (Tr. 329).  This blood work showed that Plaintiff's TSH level was 0.01, below the normal range of 0.30-5.00.  (Tr. 329).

On February 21, 2011, Dr. Esemuede saw Plaintiff for a follow-up. (Tr. 352). At this appointment, it was noted that Plaintiff stated he had been using the compression stockings for close to four (4) months without any symptom improvement, and that the varicose veins were affecting his daily living. (Tr. 352). The plan from this appointment was to proceed with the vein stripping and excision. (Tr. 352). As a result, on March 14, 2011, Dr. Esemuede performed right main greater saphenous vein trunk stripping, right medical greater saphenous vein stripping, and excision of varicose vein cluster in his right calf. (Tr. 351).

On October 12, 2012, Arshad Safi, M.D. performed a bilateral coronary angiography and a cardiovascular catheterization on Plaintiff. (Tr. 312). The impression notes stated that there is an absent left main artery, no significant coronary artery disease, abnormal left ventricular function, mild mitral valve regurgitation, moderate systemic hypertension, mild anterobasal hypokinesis, mild anterolateral hypokinesis, mild apical hypokinesis, severe diaphragmatic hypokinesis, mild posterobasal hypokinesis, moderately depressed global left ventricular function, and a mildly dilated left ventricle. (Tr. 312).

## STANDARD OF REVIEW

When considering a social security appeal, the court has plenary review of all legal issues decided by the Commissioner. See Poulos v. Commissioner of

Social Security, 474 F.3d 88, 91 (3d Cir. 2007); Schaudeck v. Commissioner of Social Sec. Admin., 181 F.3d 429, 431 (3d Cir. 1999); Krysztoforski v. Chater, 55 F.3d 857, 858 (3d Cir. 1995).  However, the court's review of the Commissioner's findings of fact pursuant to 42 U.S.C. § 405(g) is to determine whether those findings are supported by "substantial evidence."  Id.; Mason v. Shalala, 994 F.2d 1058, 1064 (3d Cir. 1993); Brown v. Bowen, 845 F.2d 1211, 1213 (3d Cir. 1988). Factual findings which are supported by substantial evidence must be upheld.  42 U.S.C. §405(g); Fargnoli v. Massanari, 247 F.3d 34, 38 (3d Cir. 2001) ("Where the ALJ's findings of fact are supported by substantial evidence, we are bound by those findings, even if we would have decided the factual inquiry differently."); Cotter v. Harris, 642 F.2d 700, 704 (3d Cir. 1981) ("Findings of fact by the Secretary must be accepted as conclusive by a reviewing court if supported by substantial evidence."); Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001); Keefe v. Shalala, 71 F.3d 1060, 1062 (2d Cir. 1995); Martin v. Sullivan, 894 F.2d 1520, 1529 & 1529 n.11 (11th Cir. 1990).

Substantial evidence "does not mean a large or considerable amount of evidence, but 'rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  Pierce v. Underwood, 487 U.S. 552, 565 (1988) (quoting Consolidated Edison Co. v. N.L.R.B., 305 U.S. 197, 229 (1938));

Johnson v. Commissioner of Social Security, 529 F.3d 198, 200 (3d Cir. 2008);

Hartranft v. Apfel, 181 F.3d 358, 360 (3d Cir. 1999).  Substantial evidence has

been described as more than a mere scintilla of evidence but less than a

preponderance.  Brown, 845 F.2d at 1213.  In an adequately developed factual

record, substantial evidence may be "something less than the weight of the

evidence, and the possibility of drawing two inconsistent conclusions from the

evidence does not prevent an administrative agency's finding from being

supported by substantial evidence."  Consolo v. Federal Maritime Commission,

383 U.S. 607, 620 (1966).

Substantial evidence exists only "in relationship to all the other evidence in

the record," Cotter, 642 F.2d at 706, and "must take into account whatever in the

record fairly detracts from its weight."  Universal Camera Corp. v. N.L.R.B., 340

U.S. 474, 488 (1971).  A single piece of evidence is not substantial evidence if the

Commissioner ignores countervailing evidence or fails to resolve a conflict

created by the evidence.  Mason, 994 F.2d at 1064.  The Commissioner must

indicate which evidence was accepted, which evidence was rejected, and the

reasons for rejecting certain evidence.  Johnson, 529 F.3d at 203; Cotter, 642 F.2d

at 706-07.  Therefore, a court reviewing the decision of the Commissioner must

scrutinize the record as a whole.  Smith v. Califano, 637 F.2d 968, 970 (3d Cir.

1981); <u>Dobrowolsky v. Califano</u>, 606 F.2d 403, 407 (3d Cir. 1979).

## SEQUENTIAL EVALUATION PROCESS

To receive disability benefits, including supplemental security income, the

plaintiff must demonstrate an "inability to engage in any substantial gainful

activity by reason of any medically determinable physical or mental impairment

which can be expected to result in death or which has lasted or can be expected to

last for a continuous period of not less than 12 months." 42 U.S.C. §

432(d)(1)(A). Further,

> [a]n individual shall be determined to be under a disability only
> if his physical or mental impairment or impairments are of such
> severity that he is not only unable to do his previous work but
> cannot, considering his age, education, and work experience,
> engage in any other kind of substantial gainful work which
> exists in the national economy, regardless of whether such
> work exists in the immediate area in which he lives, or whether
> a specific job vacancy exists for him, or whether he would be
> hired if he applied for work. For purposes of the preceding
> sentence (with respect to any individual), "work which exists in
> the national economy" means work which exists in significant
> numbers either in the region where such individual lives or in
> several regions of the country.

42 U.S.C. § 423(d)(2)(A).

The Commissioner uses a five-step process in evaluating disability and

claims for disability insurance benefits. <u>See</u> 20 C.F.R. § 404.1520; <u>Poulos</u>, 474

F.3d at 91-92. This process requires the Commissioner to consider, in sequence,

whether a claimant (1) is engaging in substantial gainful activity, (2) has an impairment that is severe or a combination of impairments that is severe, (3) has an impairment or combination of impairments that meets or equals the requirements of a listed impairment, (4) has the residual functional capacity to return to his or her past work and (5) if not, whether he or she can perform other work in the national economy. Id. As part of step four, the Commissioner must determine the claimant's residual functional capacity. Id. If the claimant has the residual functional capacity to do his or her past relevant work, the claimant is not disabled. Id. "The claimant bears the ultimate burden of establishing steps one through four." Poulos, 474 F.3d at 92, citing Ramirez v. Barnhart, 372 F.3d 546, 550 (3d Cir. 2004). "At step five, the burden of proof shifts to the Social Security Administration to show that the claimant is capable of performing other jobs existing in significant numbers in the national economy, considering the claimant's age, education, work experience, and residual functional capacity. " Id.

Residual functional capacity is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis. See Social Security Ruling 96-8p, 61 Fed. Reg. 34475 (July 2, 1996). A regular and continuing basis contemplates full-time employment and is defined as eight hours a day, five days per week or other similar schedule. The

residual functional capacity assessment must include a discussion of the individual's abilities. Id.; 20 C.F.R. §§ 404.1545 and 416.945; Hartranft, 181 F.3d at 359 n.1 ("'Residual functional capacity' is defined as that which an individual is still able to do despite the limitations caused by his or her impairment(s).").

## ALJ DECISION

At step one, the ALJ found that Plaintiff had not engaged in substantial gainful work activity from his application date of March 12, 2010,[8] his application date. (Tr. 22).

At step two, the ALJ determined that Plaintiff suffered from the severe[9] combination of impairments of the following: "Congestive Heart Failure; History of Graves Disease - resolved, now with Hypothyroidism; and Right Lower Extremity Varicosities - status post surgical management (20 C.F.R. 404.1520(c)

---

8. The administrative law judge mistakenly lists Plaintiff's SSI application filing date as March 1, 2010. (Tr. 20).

9. An impairment is "severe" if it significantly limits an individual's ability to perform basic work activities. 20 C.F.R. § 404.921. Basic work activities are the abilities and aptitudes necessary to do most jobs, such as walking, standing, sitting, lifting, pushing, seeing, hearing, speaking, and remembering. Id. An impairment or combination of impairments is "not severe" when medical and other evidence establish only a slight abnormality or a combination of slight abnormalities that would have no more than a minimal effect on an individual's ability to work. 20 C.F.R. § 416.921; Social Security Rulings 85-28, 96-3p and 96-4p.

and 416.920(c))." (Tr. 22).

At step three of the sequential evaluation process, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 416.920(d), 416.925 and 416.926). (Tr. 22).

At step four, the ALJ determined that Plaintiff had the residual functional capacity ("RFC") to perform light work with the option to sit or stand at will, and to engage in no more than occasional climbing of stairs or ladders, balancing, kneeling, crouching, or crawling. (Tr. 25). Specifically, the ALJ stated the following:

> [Plaintiff's] credibly established functional limitations secondary to his medically determinable impairments are accommodated in the above [RFC] assessment through the limitation to light work that requires no more than occasional climbing of stairs or ladders, balancing, stooping, kneeling, crouching or crawling and allows [Plaintiff] to alternate positions from sitting to standing at will. There is no credible indication in the record as a whole that [Plaintiff] is more limited than found by the undersigned.

(Tr. 29).

At step five of the sequential evaluation process, because Plaintiff could not perform any past relevant work, and considering the his age, education, work experience, and RFC, the ALJ determined "there are jobs that exist in significant

24

numbers in the national economy that the [Plaintiff] can perform (20 C.F.R.

416.969, and 416.969(a))." (Tr. 30).

Thus, the ALJ concluded that Plaintiff was not under a disability as defined

in the Social Security Act at any time between March 1, 2010, the date of the

application, and the date of the ALJ's decision. (Tr. 31).

## DISCUSSION

On appeal, Plaintiff asserts the following arguments: (1) the ALJ's

determination that the ME was qualified to present expert testimony is not

supported by substantial evidence; (2) the ALJ's determination that the ME's

opinion should be entitled to the greatest weight of all medical opinion evidence is

not supported by substantial evidence; (3) the ALJ erred in not considering the

factors listed in 20 C.F.R. § 416.927 when determining the weight to afford the

medical opinion evidence; and (4) the ALJ committed an error of law when he

failed to consider the psychiatric impairments raised by the ME. (Doc. 15, p. 5).

In the brief in opposition, Defendant disputes these claims. (Doc. 18, pp.

11-22). First, Defendant argues that there is substantial evidence to support the

ALJ's conclusion that the ME is qualified. (Doc. 18, pp. 11-12). Next, Defendant

argues that the ALJ did not commit an error of law in not considering the

psychiatric impairments raised by the ME because Plaintiff did not allege

psychiatric impairments in his application for DIB or at his hearing. (Doc. 18, p. 12). Finally, Defendant argues that substantial evidence supports the weight the ALJ afforded to the medical opinions of record. (Id. at 15-22).

### 1. **Medical Expert Qualifications**

Plaintiff contends that the ALJ's determination that the ME was qualified to present expert testimony is not supported by substantial evidence because the ME was not board certified in cardiology. (Doc. 15, p. 8). The ME testified by telephone during the oral hearing on August 18, 2011. (Tr. 58-76). At this hearing, the ALJ asked the ME: (1) whether he was board certified; (2) whether he had ever treated Plaintiff; (3) whether he recognized that he was to testify objectively regardless of the fee he received for doing so; and (4) whether he had the opportunity to review Plaintiff's medical information in the file. (Tr. 58). The ME responded that he was board certified in internal medicine, psychiatry, and forensic psychiatry, that he had not treated Plaintiff, that he recognized his duty to testify objectively, and that he had the opportunity to review Plaintiff's medical information. (Tr. 58).

On cross-examination, Defendant's attorney asked the ME whether he had "ever practiced internal medicine," to which the ME responded in the affirmative, and further stated that since 1986, he acted as a consultant in internal medicine for

the SSA, and had seen two patients with cardiac issues within the two (2) weeks prior to the hearing. (Tr. 62).  When asked whether he had any special expertise or training with regards to cardiovascular problems aside from his board certification in internal medicine, the ME responded, "I'm an expert in disability evaluations so yes, as it's linked to disability, yes sir.  I'm not doing cardiac catheterizations." (Tr. 63).  When questioned by Defendant as to whether the resume he provided to the ALJ was correct, he responded that he did not know because he did not have a copy in front of him. (Tr. 65).  When further challenged by Defendant as to his expertise in cardiovascular issues, he responded that was "a published author in the area of cardiology. . . ." (Tr. 65).

Following Plaintiff's questioning of the ME's qualifications and credibility, the ALJ stated, "I'll let you file any type of post[-]hearing item within the next week if you're challenging the doctor's qualifications[,] but at this point I'm finding him qualified to go forward." (Tr. 66).  Plaintiff noted his objection to the ME's qualifications on the administrative hearing record. (Tr. 66).  However, there is no indication that Plaintiff amended the record with evidence undermining the ME's qualifications aside from an argument made in his brief to the Appeals Council. (Tr. 66).  Furthermore, in the instant appeal, Plaintiff does not cite to evidence or any legal authority to support his position that the ALJ should not

have qualified the ME as an expert.

Upon review, it is determined that the ALJ qualified the ME as an expert in cardiovascular issues as determined.  He attended medical school, was board certified in three separate areas, including internal medicine, had addressed two (2) patients with cardiac issues in the two (2) weeks prior to the administrative hearing, and published an article regarding endocarditis, a cardiovascular disease. (Tr. 58, 62-65).  See Misavage v. Barnhart, 2001 U.S. Dist. LEXIS 23329 (E.D. Pa. Nov. 30, 2001) (holding that it was appropriate for the ALJ to rely on a medical expert who was board certified as a pediatrician, but provided testimony regarding the minor claimant's learning disabilities).  Consequently, it is determined that there is substantial evidence to support the ALJ's determination that the ME was qualified to testify as an expert.

### 2.   **Medical Opinion Evidence**

Plaintiff argues that the ALJ erred in giving significant weight to the ME's medical opinion because the ME was a non-examining, non-treating source who provided unsupported and partly inaudible testimony, and the ALJ failed to consider the factors listed in 20 C.F.R. § 416.927 when distributing the weight to the medical opinions provided by Plaintiff's physicians.  (Doc. 15, pp. 8-15).

The preference for the treating physician's opinion has been recognized by

the Third Circuit Court of Appeals and by all of the federal circuits. See, e.g.,

Morales v. Apfel, 225 F.3d 310, 316-18 (3d Cir. 2000).  This is especially true

when the treating physician's opinion "reflects expert judgment based on a

continuing observation of the patient's condition over a prolonged time."

Morales, 225 F.3d at 317; Plummer, 186 F.3d at 429; see also 20 CFR §

416.927(d)(2)(i)(1999) ("Generally, the longer a treating source has treated you

and the more times you have been seen by a treating source, the more weight we

will give to the source's medical opinion.").

However, when the treating physician's opinion conflicts with a non-

treating, non-examining physician's opinion, the ALJ may choose whom to credit

in his or her analysis, but "cannot reject evidence for no reason or for the wrong

reason." Morales, 225 F.3d 316-18.  It is within the ALJ's authority to determine

which medical opinions he rejects and accepts, and the weight to be given to each

opinion.  20 C.F.R. § 416.927.  The ALJ is permitted to give great weight to a

medical expert's opinion if the assessment is well-supported by the medical

evidence of record.  See Sassone v. Comm'r of Soc. Sec., 165 F. App'x 954, 961

(3d Cir. 2006) (holding that there was substantial evidence to support the ALJ's

RFC determination that the plaintiff could perform light work, even though this

determination was based largely on the opinion of one medical expert, because the

medical expert's opinion was supported by the medical evidence of record); <u>Baker</u>

<u>v. Astrue</u>, 2008 U.S. Dist. LEXIS 62258 (E.D. Pa. Aug. 13, 2008).

Regardless, the ALJ has the duty to adequately explain the evidence that he

rejects or to which he affords lesser weight.  <u>Diaz v. Comm'r of Soc. Sec.</u>, 577

F.3d 500, 505-06 (3d Cir. 2009) (holding that because the ALJ did not provide an

adequate explanation for the weight he gave to several medical opinions, remand

was warranted).  "The ALJ's explanation must be sufficient enough to permit the

court to conduct a meaningful review." <u>In re Moore v. Comm'r of Soc. Sec.</u>, 2012

U.S. Dist. LEXIS 100625, *5-8 (D.N.J. July 19, 2012) (citing <u>Burnett v. Comm'r</u>

<u>of Soc. Sec.</u>, 220 F.3d 112, 119-20 (3d Cir. 2000)).

Initially, it is determined that the ALJ was under no duty to give the

opinions of either Dr. Khalid or Dr. Esemuede controlling weight because these

physicians were not considered to be treating physicians based on the factors listed

in 20 C.F.R. § 416.927(d)(1)-(d)(6)[10] and the treating physicians' rule.  In <u>Morris</u>

<u>v. Barnhart</u>, the Third Circuit Court of Appeals further defined the continuing

---

10. The factors to be applied to determine the appropriate weight to be given to the
treating physician's opinion are: (1) length of treatment relationship and frequency
of examination, (2) nature and extent of the treatment relationship, (3)
supportability of the opinion by relevant evidence or explanation, (4) consistency
of the opinion with the record as a whole, (5) whether the treating physician is a
specialist, and (6) other factors which tend to support or contradict the opinion.
<u>See</u> 20 C.F.R. § 416.927(d)(1)-(d)(6).

treatment element necessary for a treating physician's opinion to be given controlling weight when it held that because the plaintiff's treating physician had only seen the plaintiff on three (3) or four (4) occasions over a two (2) to three (3) month period, the continuing treatment element was not present, and the ALJ was not obligated to give the physician's opinion any presumption of controlling weight. 78 F. App'x. 820, 823 (3d Cir. 2003). In this case, consultative examiner Dr. Khalid saw Plaintiff only one (1) time, and treating physician Dr. Esemuede saw Plaintiff only four (4) times over a period of several months. (Tr. 295, 342-343, 346-347, 351-352). Therefore, in accordance with Morris, the ALJ had no obligation to give these physicians' opinion the presumption of controlling weight due to the lack of the continuing treatment element.

Moreover, even if Dr. Khalid and Dr. Esemuede were treating physicians under the guidelines, their opinions were not consistent with or supported by the record, and thus did not need to be afforded controlling or significant weight. (Tr. 28-29). With regards to the functional limitations Dr. Khalid opined Plaintiff had, the ALJ stated:

> [Dr. Khalid's] opinion statements suggests that [Plaintiff] would be unable to complete an eight-hour workday due to limitations on standing and walking, but otherwise would have no significant limitations preclusive of a range of light work activity. The undersigned affords this opinion limited weight,

31

> to the extent it is consistent with the [RFC] set forth above.
> However, to the extent Dr. Khalid suggested greater functional
> limitations, this opinion is afforded little weight, for several
> reasons. First, Dr. Khalid's opinion is afforded lesser weight in
> deference to the more supported and more recent expert
> opinion of Dr. Brown, which, as previously discussed, was
> based upon a review of the entire record in this case. Second,
> the undersigned notes that Dr. Khalid's own objective
> examination of [Plaintiff] was entirely normal and that Dr.
> Khalid apparently did not have the opportunity to review all the
> other objective medical evidence of record. Therefore, it is
> reasonable to infer that Dr. Khalid relied quite heavily on the
> subjective report of symptoms and limitations provided by
> [Plaintiff], and seemed to uncritically accept as true, most, if
> not all, of what [Plaintiff] reported. . . . Overall, the
> undersigned finds Dr. Khalid's opinion represents an
> unsupported and subjectively based "snapshot' overestimate of
> the severity of [Plaintiff's] functional limitations and affords it
> limited weight.

(Tr. 28-29).

With regards to the functional limitations Dr. Esemuede opined Plaintiff

had, the ALJ stated:

> Interpreted broadly, [Dr. Esemuede's] opinion appears to
> suggest greater functional limitations than those found by the
> undersigned. However, the vague and conclusory nature of
> this opinion renders it less persuasive, as Dr. Esemuede
> provided very little explanation of the evidence relied on in
> forming this opinion and did not specifically indicate what he
> felt constituted "excessive walking and standing" or how high
> [Plaintiff] must elevate his legs when sitting, both of which are
> vocationally relevant to the evaluation of disability. Further,
> the undersigned notes that there is no indication in the record
> that Dr. Esemuede intended his October 2010 comments to

32

> constitute long-standing or permanent work-restrictions, as the
> recommendations to avoid excessive walking/ standing and
> elevate the legs when sitting do not appear again in Dr.
> Esemuede's records and particularly have not been noted since
> [Plaintiff] underwent definitive treatment of his lower
> extremity varicosities in March 2011 (see Exhibits 10F and
> 12F). Accordingly, the opinion evidence is afforded little
> weight in assessing [Plaintiff's] longitudinal [RFC].

(Tr. 29). Thus, based on these explanations provided by the ALJ, the opinions of

Dr. Khlalid and Dr. Esemuede were properly and appropriately given minimal

weight because they were contradictory and unsupported by the record.

Instead, the ALJ appropriately gave significant weight to the opinion of the

ME, who had a chance to review all medical evidence of record, because it was

consistent with and well-supported by the record.[11][12]  (Tr. 28).  The ALJ stated:

> [Dr. Brown's] opinion is supportive of the exertional
> limitations found by the undersigned.  Because this opinion

---

11. Because the ALJ is the fact finder with regards to Plaintiff's credibility, the
fact that the ME made statements regarding Plaintiff's credibility is not a basis for
remand.  See Wanko v. Barnhart, 91 F. App'x 771, 774 (3d Cir. 2004) (holding
that even if some of the medical expert's testimony was improper, because it was
consistent with the medical evidence, the ALJ could reject the treating physician's
opinion in favor of that of the medical expert).

12. After a review of the "inaudibles" from the ME's hearing transcript, it is
determined that because the "inaudibles" involved Plaintiff's medical
impairments, and not functional limitations that were the basis for the ME's
opinion, these "inaudibles" are immaterial and do not make the transcript "fatally
flawed to require remand." See Drejka v. Barnhart, 80 Soc. Sec. Rep. Service 157,
*27-28 (D. Del. 2002).

> was based on an expert review of all the medical evidence of
> record and [Plaintiff's] hearing testimony, is consistent with
> and supported by the objective medical evidence of record, and
> is within Dr. Brown's areas of expertise, the undersigned
> affords this opinion significant weight in establishing the above
> [RFC].

(Tr. 28). The ALJ is correct that the ME's opinion is consistent with and well-supported by the record. As the ME testified, and as the medical records reflect, Plaintiff's ejection fraction rate was between forty (40) and forty-five (45) percent, which meant that he did not have functional limitations. (Tr. 303-304, 312, 321, 327). Clinical findings were reported as normal by Dr. Cabello, Dr. Michael, and Dr. Khalid. (Tr. 321, 324-328, 335-336). Additionally, after a successful varicose vein surgery in March of 2011, Dr. Esemuede did not state that Plaintiff had any remaining functional limitations. (Tr. 48-49, 55, 351).

Consequently, upon review of the entire record, and in consideration of applicable statutes and precedent, it is determined that the ALJ committed no error in assigning greater weight to the ME's opinion because it was consistent with and supported by the record, and because the ALJ considered the factors set forth in 20 C.F.R. § 416.927(d) and adequately discounted the medical opinions of Dr. Khalid and Dr. Esemuede. Accordingly, it is determined that there is substantial evidence to support the ALJ's decision to give more weight to the ME's medical opinion in

determining Plaintiff's RFC.

### 3.   <u>Mental Health Impairments</u>

Plaintiff contends that because the ME stated that there were psychological impairments that could affect the Plaintiff's ability to work, the ALJ should have addressed these mental health impairments. (Doc. 15, p. 16). However, it is well-settled that "[t]here is no requirement that an ALJ consider impairments that a claimant does not allege are disabling." <u>Podsiad v. Astrue</u>, 2010 U.S. Dist. LEXIS 31636, *63-64 (D. Del. Feb. 22, 2010) (holding that plaintiff's obesity was not a reason to remand the case because plaintiff did not allege obesity in his application or at his hearing), <u>citing</u> <u>Rutherford v Barnhart</u>, 399 F.3d 546, 552-53 (3d Cir. 2005). Based on this rationale, the ALJ did not have the obligation to address any mental health impairments raised by the ME because they were not alleged by Plaintiff in either the application or at the hearing. As such, it is determined that there is substantial evidence to support the ALJ's decision to not address the psychological impairments discussed by the ME.

## <u>CONCLUSION</u>

Based upon a thorough review of the evidence of record, the Court finds that the Commissioner's decision is supported by substantial evidence. Therefore, pursuant to 42 U.S.C. § 405(g), the decision of the Commissioner will be affirmed and the appeal will be denied.

A separate Order will be issued.


**Date**: September 30, 2014


United States District Judge